## CAPITAL AIRLINES, INC., v. FRANCES S. BARGER, Admx. —341 S. W. (2d) 579.

Eastern Section. August 1, 1960.

Rehearing Denied September 8, 1960.

Certiorari Denied by Supreme Court December 9, 1960.

638

Folts, Bishop & Thomas, Chattanooga, for plaintiff in error.

Harry Berke and A. A. Wassick, Chattanooga, for defendant in error.

HOWARD, J. Referring to the parties as they appeared below, this tort action grew out of an airplane accident which occurred when a four-motored Viscount

passenger plane, owned and operated by the defendant, Capital Airlines, Inc., crashed in a field approximately 2,200 feet short of the south end of runway No. 5, at the Tri-City Airport near Saginaw, Michigan. The accident occurred on the night of April 6, 1958, at 11:19 P. M. under circumstances hereinafter appearing. At the time the plane was approaching said runway to make a routine landing at the Airport. Plaintiff's husband, Dan M. Barger, age 28, was a passenger on the ill-fated plane, and he and 43 other passengers and the crew of 3 all perished in the crash.

Plaintiff, who qualified as Administratrix of her husband's estate in Hamilton County, Tennessee, sued the defendant for damages for the death of her husband, as provided by the wrongful death statute of the State of Michigan, her declaration alleging that the plane crashed short of the runway because of the negligence of the defendant in the following respects: "Failing to land the plane in a careful manner; failing to have the plane under proper control; failing to keep a proper lookout ahead for the runway; failing to provide or use proper instruments to guide the plane to a landing; and in failing to exercise a high degree of care to transport plaintiff's husband to his destination."

By general plea the defendant denied liability, and being ordered to plead specially, the defendant averred: "That the plane was properly equipped, had recently undergone inspection and had been found in good mechanical condition; that the defendant complied with all the rules and regulations of the Civil Aeronautics Board with regard to all phases of operation, maintenance, repair and use of the aircraft and the competency, skill and physical condition of the pilots; that the pilot for

this flight was well qualified and thoroughly experienced; that the plane was making a routine approach to landing and had straightened out on its final approach when the nose of the plane dropped abruptly and the plane dove into the ground; that the accident was the result of an act of God and occurred because of an unusual, unforeseeable meteorological phenomenon which caused the plane to become uncontrollable, humanly, mechanically, or otherwise.''

By replication the plaintiff joined issue upon the special pleas, and, thereupon, the case proceeded to trial before a jury.

There were two trials in which the defendant made motions for peremptory instructions at the conclusion of all the evidence introduced upon each trial. These motions were overruled. The first trial resulted in a mistrial, because the jury was unable to agree, and by reason of the trial judge's refusal to sustain defendant's motion for peremptory instructions, the defendant preserved and has filed a Wayside Bill of Exceptions. The second trial resulted in a jury verdict for the plaintiff for $110,000, which the trial judge approved, and judgment was entered. Defendant filed motion for a new trial and for a directed verdict, which motion was overruled, and this appeal in error was prayed, granted and perfected.

The defendant concedes that the evidence introduced on both trials was substantially the same. This concession, therefore, obviates the procedural requirement of our reviewing here the record of the first trial, although we have carefully and painstakingly read the records of both trials, in order to get a more complete understanding of the case.

Defendant's assignments of error are directed to (1) the sufficiency of the evidence; (2) alleged errors in the charge; (3) the denying of certain requests; (4) the exclusion of certain evidence, and (5) the amount of the verdict.

The rule is well settled that where there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from all the evidence, a motion for a directed verdict must be overruled. Lackey v. Metropolitan Life Ins. Co., 30 Tenn. App. 390, 206 S. W. (2d) 806; East Tenn. Natural Gas Co. v. Peltz, 38 Tenn. App. 100, 270 S. W. (2d) 591.

We shall now review briefly the evidence as reflected by the record:

On the night of the ill-fated crash, the proof showed that the weather was disagreeable, but not unusually hazardous for flying. There was a mixture of slight rain, sleet and snow, with gusts of wind ranging from 18 to 27 knots per hour. At 11 P. M., only a few minutes before the crash, the weather observer in the tower at the airport recorded a 900 feet ceiling overcast, with visibility of 3 miles. None of these conditions was described as dangerous for the safe landing of planes. In fact only a few minutes before the crash two other planes had landed safely on runway 5, and these pilots testified that they experienced no trouble, and had found the weather much better than reported to them by the weather observer.

As the ill-fated plane approached the airport for a landing, it appears that it made a wide swing and missed the runway; that after circling the airport in a slight bank, the plane returned and approached the runway

much "slower and lower" than had planes previously at this point. On descending to a point about 2,200 feet short of the runway, the plane, traveling at an estimated height of from 250 to 500 feet, suddenly nosed down at an angle of from 45 to 60 degrees and crashed to the ground. By the force of the impact the motors were buried in the dirt about 3 feet, and the forward momentum of the plane caused it to flip over on its back. After coming to rest the tail of the plane was pointing toward the runway on which it had expected to land. On striking the ground the plane burst into flames, making it impossible for any of the passengers or crew to escape.

It further appears that the plane was fully loaded with passengers, and that at a stop only 20 minutes previously had been refueled; that the plane was bound to accumulate some ice under prevailing weather conditions, necessitating the use of the de-icer, and that as ice accumulated it was necessary to increase the power. There were admissions by defendant's witnesses that the Dowmic switch, a pre-stall warning device, was found to be in a malfunctioning condition after the crash, but that defendant's pilots did not rely upon this device. Also that the pilot of the ill-fated plane had made "below average grade" on some of the phases of his pre-flight tests.

An investigation following the accident by the Civil Aeronautics Board disclosed that the crash did not result from the failure of any structural parts of the plane, nor was there any proof whatsoever by pilots or weather observers of any unusual weather phenomenon in the area that caused or remotely contributed to the cause of the crash.

It was conceded that the defendant's pilot had the exclusive control and management of the plane; that defendant was a public carrier for hire; that plaintiff's intestate was a paying passenger, and that defendant owed him the highest degree of care.

On behalf of the defendant it is insisted here, as it was below, that the proof showed that it was impossible for a plane flying at the altitude of 250 to 500 feet to crash as did the plane in question; that under the prevailing conditions had there been a failure of motors, or had the pilot turned loose of the controls, or flown too low, the plane would not have nosed down abruptly, but would have mushed into a pancake landing and spread wreckage over a great area.

■ ■ Were the above facts sufficient to warrant the jury in finding an inference or presumption of negligence under the doctrine of res ipsa loquitur? We think that they were, as it devolved upon the defendant to rebut the inference or presumption by showing that the crash was unavoidable, and could not have been prevented by the exercise of the highest degree of care.

Regarding the application of the doctrine of res ipsa loquitur, the Middle Section of this Court, speaking through Felts, Judge, in Sullivan et ux. v. Crabtree. 36 Tenn. App. 469, 258 S. W. (2d) 782, 783, said:

"The classic statement of the doctrine of res ipsa loquitur is this: '(W)here the thing (causing the harm) is shown to be under the management of defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of expla-

nation by the defendants, that the accident arose from want of care.' Erle, C. J., Scott v. London and St. Katherine Docks Co. (1865), 3 H. & C. 596, 159 Eng. Reprint 665, 667.

"This statement has been accepted in our cases. John Bouchard & Sons Co. v. Keaton, 9 Tenn. App. 467, 479; North Memphis Savings Bank v. Union Bridge & Const. Co., 138 Tenn. 161, 177, 196 S. W. 492; Lewis v. Casenburg, 157 Tenn. 187, 7 S. W. (2d) 808, 60 A. L. R. 254; Poor Sisters of St. Francis v. Long, 190 Tenn. 434, 230 S. W. (2d) 659.

"The maxim res ipsa loquitur means that the facts of the occurrence evidence negligence; the circumstances unexplained justify an inference of negligence. In the principle of proof employed, a case of res ipsa loquitur does not differ from an ordinary case of circumstantial evidence. Res ipsa loquitur is not an arbitrary rule but rather 'a common sense appraisal of the probative value of circumstantial evidence.' Boykin v. Chase Bottling Works, 32 Tenn. App. 508, 520-523, 222 S. W. (2d) 889, 896.

\* \* \* \* \* \*

" 'A res ipsa loquitur case is a circumstantial evidence case which permits a jury to infer negligence from the mere occurrence of the accident itself.' Prosser, Res Ipsa Loquitur in California, 37 Cal. L. Rev. 183, 191. So after proof of the rem the adding of another fact or facts may supply the explanation and take the case out of the rule. For example, see Granert v. Bauer, 17 Tenn. App. 370, 373, 67 S. W. (2d) 748 (where driver ran out of road

trying to miss a hole) ; Oliver v. Union Transfer Co., 17 Tenn. App. 694, 698, 71 S. W. (2d) 478 (where side of road caved in taking the bus with it).

*    *    *    *    *    *

"It is true there has been confusion in the cases as to the procedural effect of res ipsa loquitur, some cases giving it one and some another of these three different effects:

"(1) It warrants an inference of negligence which the jury may draw or not, as their judgment dictates. Poor Sisters of St. Francis v. Long, 190 Tenn. 434, 442-443, 230 S. W. (2d) 659; Boykin v. Chase Bottling Works, 32 Tenn. App. 508, 522-523, 222 S. W. (2d) 889.

"(2) It raises a presumption of negligence which requires the jury to find negligence if defendant does not produce evidence sufficient to rebut the presumption. Gill v. Brown, 130 Tenn. 174, 178, 169 S. W. 752; Kay v. Metropolitan Street R. Co., 163 N. Y. 447, 57 N. E. 751; Prosser on Torts, 304; cf. Foltis, Inc. v. City of New York, 287 N. Y. 108, 38 N. E. (2d) 455, 153 A. L. R. 1122; Annotation, 153 A. L. R. 1134.

"(3) It not only raises such a presumption but also shifts the ultimate burden of proof to defendant and requires him to prove by a preponderance of all the evidence that the injury was not caused by his negligence. Turnpike Co. v. Yates, 108 Tenn. 428, 434, 67 S. W. 69; Gorsuch v. Swan, 109 Tenn. 36, 69 S. W. 1113, 97 Am. St. Rep. 836; Prosser on Torts, 304, 305.

"For a review of the numerous cases and a clear and helpful discussion of the subject, see: Prosser, The Procedural Effect of Res Ipsa Loquitur (1936), 20 Minn. L. Rev. 241-271; Prosser, Res Ipsa Loquitur in California (1949), 37 Cal. L. Rev. 183-234; Prosser on Torts (1941), 291-310.

"The effect of a case of res ipsa loquitur, like that of any other case of circumstantial evidence, varies from case to case, depending on the particular facts of each case; and therefore such effect can no more be fitted into a fixed formula or reduced to a rigid rule than can the effect of other cases of circumstantial evidence. The only generalization that can be safely made is that, in the words of the definition of res ipsa loquitur, it affords 'reasonable evidence,' in the absence of an explanation by defendant, that the accident arose from this negligence.

\*    \*    \*    \*    \*    \*

"In the ordinary case, however, res ipsa loquitur merely makes a case for the jury—merely permits the jury to choose the inference of defendant's negligence in preference to other permissible or reasonable inferences. North Memphis Savings Bank v. Union Bridge & Const. Co., 138 Tenn. 161, 188, 196 S. W. 492; John Bouchard & Sons Co. v. Keaton, 9 Tenn. App. 467, 480-481; Boykin v. Chase Bottling Works, 32 Tenn. App. 508, 523, 222 S. W. (2d) 889; Poor Sisters of St. Francis v. Long, 190 Tenn. 434, 442-443, 230 S. W. (2d) 659; Prosser, Res Ipsa Loquitur in California, 37 Cal. L. Rev. 183, 217-225."

It is insisted, however, that in airplane crashes the doctrine of res ipsa loquitur has been rejected by the

Courts of Tennessee, and defendant relies principally upon Boulineaux v. City of Knoxville, 20 Tenn. App. 404, 99 S. W. (2d) 557, and Towle v. Phillips, 180 Tenn. 121, 172 S. W. (2d) 806.

In the Boulineaux case, decided in 1935, the plaintiffs sued for injuries sustained by a crash of the plane which was carrying them as passengers for hire on a sightseeing flight. The crash resulted from the stalling of the motor after the plane had proceeded approximately one-half mile from the point of take off. There was a judgment for the defendants, and on affirming the judgment this Court rejected the doctrine of res ipsa loquitur because "it is a common and not an unusual occurrence for airplanes to stall and fall while in operation, and without the intervention of any act upon the part of the operator." [20 Tenn. App. 404, 99 S. W. (2d) 561.]

In Towle v. Phillips, supra [180 Tenn. 121, 172 S. W. (2d) 808], decided in 1943, the Supreme Court refused to apply the doctrine of res ipsa loquitur because (1) the plane had dual controls, one of which was accessible to the passenger, and (2) the operation of aircraft had not attained the position "where the doctrine of cases dealing with stagecoaches or trolley cars or steam railways can be applied."

In this enlightened age, it is common knowledge that within the past two decades tremendous improvements have been effected in the design and construction of airplanes, and in their operation and maintenance. Today an airplane is considered as a reasonably safe means of rapid transportation. Daily there are thousands of transport planes flying according to fixed schedules throughout the world carrying thousands of passengers

annually, and airplane lines are vigorously competing with railroads, bus lines and steam ships. When the Boulineaux and Towle cases were decided, the development of air transportation could be appropriately termed as being in its adolescent stages. But since World War II, the development of aviation has been amazingly rapid, and the modern trend of authority seems to hold the rule of res ipsa loquitur applicable to airplane cases. In the field of aviation, as in other fields of transportation, accomplishment and liability are inseparable, and it appears to us that the principles governing liability of other common carriers should now be equally applicable to transport airplanes operating as such.

In American Jurisprudence, it says:

"The doctrine of res ipsa loquitur, which asserts that whenever a thing which produced an injury is shown to have been under the control and management of the defendant, and the occurrence is such as in the ordinary course of events does not happen, if due care has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care, has generally been applied to airplane accidents. The doctrine has been applied most frequently in actions for the injury or death of passengers for hire, and it has been stated that to be peculiarly suitable in actions against common carriers, due to the higher degree of care required." Vol. 6, Sec. 77, p. 45.

For a review of the decisions of other States applying the rule of res ipsa loquitur to airplane cases, see 6 A. L. R. (2d) p. 528.

Accordingly, as the law is progressive and expansive, adapting itself to the new relations and interests which are constantly springing up in the progress of society, we are constrained to hold the doctrine of res ipsa loquitur applicable under the facts and circumstances presented in the instant case.

Defendant insists that the trial Court erred in charging the rule of res ipsa loquitur, because (1) the accident having occurred in the State of Michigan, the law of that State would govern; and (2) that the Courts of the State of Michigan have never adopted said doctrine.

In this State, the doctrine of res ipsa loquitur has been recognized as a rule of evidence, Quinley v. Cocke, 183 Tenn. 428, 192 S. W. (2d) 992; Oliver v. Union Transfer Co., 17 Tenn. App. 694, 71 S. W. (2d) 478; and where there is a conflict, the questions of evidence are governed by the law of the forum. Shepard & Gluck v. Thomas, 147 Tenn. 338, 246 S. W. 836; 11 Am. Jur., Secs. 203, 204, pp. 521, 524; 31 C. J. S. Evidence sec. 5, p. 509.

In 31 C. J. S. sec. 5, supra, it says:

"It is well established that the courts of one state or country are not bound by the rules of evidence adopted in another jurisdiction, but the admissibility of evidence, as well as the burden of proof, and weight and sufficiency of evidence, is always governed by the lex fori."

While it appears that the Courts of Michigan have rejected the term "res ipsa loquitur," Rebentisch v. Korda, 331 Mich. 656, 50 N. W. (2d) 192, 194, nevertheless, the Courts of that State have recognized and applied the principle in numerous cases under the circumstantial evidence rule. Barnowsky v. Helson, 89 Mich. 523, 50 N. W. 989, 15 L. R. A. 33; Sewell v. Detroit United Railway, 158 Mich. 407, 123 N. W. 2; Indiana Lumbermens Mut. Ins. Co. v. Matthew Stores, Inc., 349 Mich. 441, 84 N. W. (2d) 755, and cases cited therein.

■ Defendant further complains (1) of other portions of the trial Judge's charge, and (2) his refusal to charge certain special requests. After carefully considering the portions complained of in the light of the general charge, we find no errors that would justify a reversal of the case. T. C. A. secs. 27-116, 27-117. Nor is there an affirmative showing that the requests which were refused affected the results of the trial. T. C. A. sec. 27-117. De Rossett v. Malone, 34 Tenn. App. 451, 239 S. W. (2d) 366. The entire charge, which covered several pages of the record, was clear, comprehensive and reasonably complete, and conformed generally with the law as stated in Sullivan et ux. v. Crabtree, supra, and cases cited therein.

Next the defendant complains because the trial Judge excluded from the jury portions of testimony offered by defendant's witness, Josephine Bosarge. The testimony excluded was put in the record and is before us. The substance of the excluded testimony is that plaintiff and her husband were separated at the time of his death; that they separated in Chattanooga in 1957, while decedent was employed as manager of a shoe store operated by the Butler Shoe Company, in Birmingham, Alabama;

that, thereafter decedent saw Miss Bosarge regularly every week-end at her home in Biloxi, Mississippi; that when decedent would return to Chattanooga to visit his little daughter, Dianne, age 6, he would call this witness on the telephone every night; that after the decedent accepted a position as salesman with Dr. Scholl's and went to Chicago in March 1958, he called witness on the telephone on numerous occasions and corresponded regularly with her; that the witness and decedent had discussed marriage, and had planned to marry as soon as plaintiff and decedent were divorced.

Plaintiff had denied that she and her husband were separated at the time of his death, or that they were contemplating divorce at the time. To the contrary she testified that they were happily married, and that he had contributed most liberally toward the support of his family; that they had had only one estrangement in December, 1957, when they agreed to separate and she sued for divorce; that within 2 weeks after the divorce petition was filed, they became reconciled and the petition was later dismissed, and that they had been happy following reconciliation.

██ The wrongful death Statute of the State of Michigan, Sec. 27-712, Comp. Laws 1948, sec. 691.582, provides that "the court or jury may give such damages, as, the court or jury, shall deem fair and just, with reference to the pecuniary injury resulting from such death." Under the Michigan decisions, the measure of recovery seems to be based upon what the family was accustomed to receive, or had *reasonable expectation of receiving during the decedent's lifetime.* Chicago & N. W. Ry. Co. v. Bayfield, 37 Mich. 205; Ingersoll v. Detroit & M. Ry.

Co., 163 Mich. 268, 128 N. W. 227, 32 L. R. A., N. S., 362; Meola v. Quincy Mining Co., 174 Mich. 305, 140 N. W. 460. Therefore, testimony throwing any light upon what the pecuniary injury resulting from such death would be, is admissible. Rajnowski v. Detroit, B. C. & A. R. Co., 74 Mich. 20, 41 N. W. 847. (Emphasis supplied.)

▉▉ Under the above decisions, it is apparent that the amount which a husband would be expected to contribute during his lifetime would in some measure be expected by his relationship with his family. If that relationship were amicable, intimate and close, then the contribution would be expected to be greater than if the relationship were distant, unfriendly and strained. Hence, evidence as to a loving relationship between a husband and his family would be admissible on the question of damages for his death, and by the same token evidence that no loving relationship existed between the husband and his family would likewise be admissible. See also 16 Am. Jur. 236, p. 157; Annotation 74 A. L. R. 31. Accordingly, for reasons stated, we think that the Court erred in excluding the testimony of this witness.

▉ Finally, the defendant urges that the amount awarded by the jury is excessive.

Decedent, who was 28 years of age at the time of his death, had a life expectancy of 42.15 years under the Tennessee Mortality Tables. He was born and reared in Chattanooga, and was a high school graduate. While in high school and after graduation, he worked for the Butler Shoe Company, which operates a chain of shoe stores in several Southern cities. In 1955, he was promoted to store manager, in which capacity he was thereafter sent to various cities, including Birmingham, Ala-

bama, Biloxi, Mississippi, and Raleigh, North Carolina. His salary for the year 1957 amounted to $7,247.15, two-thirds of which, according to the plaintiff, he contributed to her and Dianne's support. About January 1, 1958, decedent accepted a position as salesman with the Dr. Scholl's Company, manufacturer of shoes, innersoles, etc., and was sent to school in Chicago by this Company where he was a student at the time of his death. Just what salary he would have earned in his new position is not indicated. Previous to the ill-fated crash, decedent had left Chicago and at the time was on his way to Flint, Michigan, where he intended to spend the weekend at the home of Mr. and Mrs. Mackay, an aunt and uncle of Josephine Bosarge.

Admittedly, the size of the judgment has given us much concern as we have been unable to find any Michigan cases, nor has counsel for plaintiff pointed to any cases from that jurisdiction, approving judgments of like amounts in death cases. Likewise, we have found none in Tennessee. As heretofore pointed out, portions of the testimony of defendant's witness Bosarge were improperly excluded, and while this excluded testimony did not go to the issue of liability, it was pertinent to the issue of damages and the jury should have been allowed to determine its value, in the light of plaintiff's testimony. Under these circumstances, we feel that the error could be corrected if a remittitur were granted. City of Maryville v. McConkey, 19 Tenn. App. 520, 90 S. W. (2d) 951; 5B C. J. S. Appeal and Error sec. 1869, p. 312. This would obviate the necessity of another trial and at the same time do substantial justice to both parties. For the reasons stated, we are, therefore, constrained to order a remittitur of $12,500, and if accepted, judgment will be

entered here for $97,500, at plaintiff-in-error's costs. If rejected, the judgment below will be reversed and the case will be remanded for a new trial.

McAmis, P. J., and Hale, J., concur.

## On Petition to Rehear

HOWARD, J. Defendant, Capital Airlines, Inc., has filed petition to rehear in which it is respectfully requested that we (1) respond to the 9th assignment of error, and (2) disallow interest on the judgment.

By the 9th assignment of error it is urged "that the verdict of $110,000.00 was excessive as a matter of law because the best proof of the plaintiff under the Michigan Wrongful Death Act would have entitled her to a maximum recovery of about $97,500.00."; that under the circumstances the trial Judge erred in refusing defendant a new trial.

As pointed out in our original opinion, the decedent's "salary for the year 1957 amounted to $7,347.15, two-thirds of which, according to the plaintiff, he contributed to her and Dianne's support." There was also proof, undisputed, that decedent was capable of earning in excess of $9,000 a year as a salesman.

Based upon what the decedent's family was accustomed to receiving, and taking into consideration what they had reasonable expectation of receiving during his life expectancy of 42.15 years, we cannot arbitrarily say as matter of law that the amount awarded by the jury was excessive under the proof. Therefore, the 9th assignment of error is overruled.

■ Regarding interest, T. C. A. sec. 47-1610 provides that "Interest shall be computed on every judgment from the day on which it was entered of record." In construing the above statute, our Courts have held that interest shall be computed from the date of judgment overruling motion for a new trial. Monday v. Millsaps, 197 Tenn. 295, 271 S. W. (2d) 857; Tenn. Elec. Power Co. v. Hanson, 18 Tenn. App. 542, 79 S. W. (2d) 818.

Accordingly, for reasons indicated, the petition to rehear is denied at petitioner's costs.

McAmis, P. J., and Hale, J., concur.